Filed 3/27/24  P. v. Hernandez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCO TORRES HERNANDEZ,<br><br>    Defendant and Appellant. | D081604<br><br><br><br>(Super. Ct. No. SCS320214) |

APPEAL from a judgment of the Superior Court of San Diego County, Maryann D'Addezio, Judge.  Affirmed.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kathryn Kirschbaum and Sahar Karimi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Marco Torres Hernandez guilty of two counts of corporal injury to a significant other, victim A.S., with infliction of great bodily injury (Pen. Code, §§ 273.5, subd. (a), 12022.7, subd. (e)); two counts of disobeying a

court order (*id.*, § 273.6, subd. (a)); and one count of stalking while a court order was in effect (*id.*, § 646.9, subd. (b)). Hernandez contends on appeal that the trial court prejudicially erred by: (1) admitting screenshots of text messages into evidence without proper authentication; (2) allowing rebuttal testimony about Hernandez's character for violence under Evidence Code[1] section 1103, subdivision (b); (3) instructing the jury on the union of act and general intent instead of the union of act and specific intent; and (4) failing to instruct the jury on the applicable burden of proof for the rebuttal evidence admitted under section 1103, subdivision (b). Hernandez also asserts that if his counsel invited error by opening the door to admitting rebuttal testimony for his character for violence, he was deprived of his right to effective assistance of counsel.

We conclude that the trial court did not abuse its discretion by admitting screenshots of text messages, or by admitting rebuttal testimony about Hernandez's character for violence. We further conclude that Hernandez has not established any ineffective assistance of counsel claim based on the admission of the rebuttal testimony. Lastly, we conclude that the court did not prejudicially err in instructing the jury on the union of act and intent, or regarding section 1103 evidence. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Uncharged Incidents in February, July, and September 2021*

The jury heard testimony from 13 witnesses over the course of four days. A.S. testified that she and Hernandez started dating in late 2020 and often spent time together at A.S.'s house in Chula Vista, California.

---

1      Further undesignated statutory references are to the Evidence Code.

Hernandez had his own separate residence. They have no children together, but A.S. has a daughter, V.S., who was a child at the time of trial.

A.S. described Hernandez as controlling, abusive, aggressive, and jealous. In February 2021, they were in the kitchen and Hernandez got angry with A.S. He pulled her hair, slammed her against the wall, and strangled her with both hands. He lifted her up as he choked her, bruising her neck and causing a blood vessel in her eye to pop. A.S. did not tell anyone about the incident out of fear and embarrassment, and she did not call 911 because Hernandez told her that if "something happened to him, [A.S.] would pay for it."

In July 2021, Hernandez pulled A.S. out of the house and pushed her into his brother's car, even though she told him her daughter V.S. was still at home. A.S. resisted getting into the car, but Hernandez forced her inside and started arguing with her. V.S., who saw this happen, called A.S.'s mother to ask for help. V.S. testified that she saw Hernandez grab A.S. and drive off while "half of [A.S.'s] body was . . . outside the car." As Hernandez drove, he took A.S.'s phone and threw it out of the car. After about 20 minutes, A.S. was able to get out of the car and walk home. A.S. did not report the incident because Hernandez threatened to hurt her and her family.

A few days later, Hernandez was driving A.S. home and started arguing with her. He began accelerating and trying to take off A.S.'s seatbelt, threatening to crash the car. Then he punched A.S. in the eye with a closed fist, giving her a black eye. After they got to her house, A.S. locked herself inside, but Hernandez banged on the door and tried to reach her by phone. He left and came back to the house periodically throughout the night, banging on the door and calling A.S.'s phone. He also attempted to break into the house through the back door and a bathroom window. A.S. called

3

911 and officers came to the home to take pictures of her injuries and write a report, but Hernandez left before the officers arrived.

On July 29, 2021, soon after that incident, A.S. obtained a civil domestic violence restraining order (DVRO).

In early September 2021, before Hernandez had been served with the DVRO, he came to A.S.'s house at night unannounced. She called the police, but before they arrived Hernandez forced entry into the house and told A.S. that if he went to jail, she and her "whole family would pay for it." When police officers arrived and asked A.S. if anyone was inside the house, she said she and her daughter were alone because she was afraid of what Hernandez might do. A.S. said she tried to signal to the officers with her eyes and body language that Hernandez was nearby. The police officers eventually heard Hernandez making noises in the backyard and detained him. Hernandez was served with the DVRO the next day on September 9, 2021.

*B. Charged Incidents in September and October 2021*

Even though the DVRO prohibited Hernandez from contacting A.S. or coming within 100 yards of her home, in late September 2021 he sent her crude text messages, called her multiple times, and showed up at her house accusing her of cheating. A.S. knew it was Hernandez contacting her because he had the same phone number while they dated and his number was saved in her phone. A.S. called 911, but Hernandez left before officers arrived.

Hernandez came to A.S.'s home three more times in October 2021. The first time, in early October, A.S. invited him over to try and "work things out." But she discovered nude pictures and videos of another woman, N.L., on his phone. When Hernandez, A.S., and N.L. met at a trolley station, A.S. and N.L. got into a fight. According to A.S., N.L. attacked her first by grabbing her hair, and Hernandez ultimately broke up the fight.

4

The second time, a few weeks later, Hernandez was yelling, pounding on the door, and calling A.S. A.S. notified the police, but Hernandez left before they arrived. Later A.S. noticed that her doorbell camera was damaged, and that Hernandez had pulled the screen door open.

The third time, around the end of October, A.S. met with Hernandez to try to "make up and work things out." After A.S. went to bed, Hernandez pulled her by her feet and told her to get up and get dressed. They argued, and at some point Hernandez held A.S. down on the bed by her wrists and punched the headboard. After A.S. got out of bed, he threw her "around the room" like "a rag doll." After she tried to calm him down, they fell asleep. The next morning, they began arguing in the kitchen while A.S. was cooking breakfast. When she tried to open the front door to let out smoke, Hernandez slammed the door into her face, breaking her nose. She texted her sister to call the police, and when a dispatcher called A.S., she pretended she was talking to her sister on the phone because Hernandez was still in the house.

Police came to her home, but again, Hernandez was gone before they arrived. After A.S. spoke with the responding officers, she went to the emergency room to be treated for her injuries. She still had bruises on her arm and body from the previous night.

On November 15, 2021, A.S. obtained a criminal DVRO against Hernandez.

*C. Charged Incidents in April 2022*

Hernandez came to A.S.'s house several times in April 2022 while the criminal DVRO was in effect. The first time in early April when A.S. was at work, she received a cell phone notification that someone was at her door. When she checked the live video stream from her doorbell camera, she saw Hernandez looking through the window and trying to break into the house

5

through the front door.  He also called and texted A.S.  A.S. notified the police and recorded some of the live footage from her phone showing Hernandez standing outside of her front door.  As she recorded the streaming video, her phone also recorded his incoming messages in real time, including "Fuck u" and "Bitch[.]"  She also took screenshots of text messages she received later that afternoon saying, "Answer me or imdestory [*sic*] ur house[,]" "I'm kill ub[,]" and "Alright.  I'm after ur family."  A.S. knew those messages came from Hernandez because she saved his contact information in her phone.

Later that day when A.S. was home with her daughter, Hernandez showed up again, yelling outside of her house.  A.S.'s daughter ran into the bedroom closet and called 911, but Hernandez left again before the police arrived.

Two days later, Hernandez returned in the middle of the night after calling A.S. multiple times.  A.S. did not see the calls because she was asleep with her daughter.  Hernandez forced his way into A.S.'s home and started accusing A.S. of infidelity.  V.S. ran into the bedroom closet and again called 911, but Hernandez fled.  She said she ran to the closet so that Hernandez would not hear her, because "in the past when [V.S.] called the police, they were too late to catch him."  In a 911 dispatch recording from that night, she had trouble speaking clearly because she was crying out of fear for her mother's safety.

Three days later, Hernandez showed up again in the middle of the night while A.S. and her daughter were sleeping.  When A.S. opened the door to ask him what he was doing there, he splashed beer in her face.  She called the police, but Hernandez left before they arrived.  He showed up to her house again the following night calling, ringing the doorbell, and knocking on the window, so she called the police again to report the incident.

6

Less than two weeks later, A.S. got a cell phone notification while she was at work because Hernandez was at her front door again. He had been calling and messaging her throughout the previous night and that morning, which was documented in her phone's call log. She took a screenshot of Hernandez standing at her door and called the police. Hernandez left before the police arrived, but he was still calling A.S., so the officers instructed her to answer. A.S. was able to get Hernandez to tell her where he was while the officers listened, and they arrested him that day.

A.S. said that during and after these incidents, she "was always in fear something [was] going to happen" to her, making it difficult to concentrate at work and sleep at night. A.S. felt anxious, fearful, and isolated from her family because she did not want them to see the effects his abuse had on her. She was also concerned for her daughter's safety and worried about how Hernandez's behavior would impact her. A.S. quit her job at some point because Hernandez knew where she worked, and she was afraid he would "get people" to hurt her.

*D. Pre-Trial Proceedings*

The People charged Hernandez with two counts of corporal injury to a significant other with infliction of great bodily injury (Pen. Code, §§ 273.5, subd. (a), 12022.7, subd. (e)) in connection with the incidents in late October 2021 when A.S. broke her nose and received bruises; two counts of disobeying a court order (*id.*, § 273.6, subd. (a)) for acts between late September and late October 2021; and one count of stalking with a court order in effect (*id.*, § 646.9, subd. (b)) in connection with the April 2022 incidents.

The day before trial in October 2022, Hernandez's counsel filed a motion in limine seeking to admit evidence of A.S.'s character for violence under Evidence Code section 1103, subdivision (a). Subdivision (a) provides,

7

in relevant part, that in a criminal action, "evidence of the character or a trait of character . . . of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] [] Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. . . ."[2]  (§ 1103, subd. (a).)

Specifically, Hernandez sought to elicit testimony from N.L. about her fight with A.S. in October 2021 to show A.S.'s character for violence. Although N.L. testified at the preliminary hearing, the defense only learned of her altercation with A.S. shortly before trial.  Hernandez's motion in limine argued that such evidence would "confirm the defendant's assertion that the victim was the aggressor[]" and that A.S. "act[ed] aggressively towards Mr. Hernandez and his family and friends."  Hernandez's counsel also argued that because A.S. "feigned" not knowing N.L. during the preliminary hearing, N.L.'s testimony would be relevant to impeach A.S.'s credibility.  When the court asked whether Hernandez would present "some sort of a self-defense" argument, or assert that A.S. "started it," his attorney said "[t]hat is something that's going to come out at trial[.]"  His attorney also claimed that the evidence would be "relevant as to the violence within the relationship with Mr. Hernandez[.]"

---

[2]     Section 1101 provides, in relevant part, that "[e]xcept as provided in this section and in Sections . . . 1103 . . . and 1109, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  (§ 1101, subd. (a).)

In cases where a charge involves domestic violence, section 1109, subdivision (a)(1), allows evidence of the defendant's acts of domestic violence if the evidence is not otherwise inadmissible because its probative value is substantially outweighed by undue consumption of time, prejudice, or confusion.  (§§ 352, 1109, subd. (a)(1).)

The prosecutor argued that N.L.'s testimony was irrelevant because it had little to do with A.S.'s propensity for violence against Hernandez. The prosecutor said, however, that he intended to investigate the incident and determine whether to rebut the proposed character evidence under section 1103, subdivision (b). Subdivision (b) provides, in relevant part, that "evidence of the defendant's character for violence or trait of character for violence . . . is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

The court granted Hernandez's motion in limine to admit N.L.'s testimony under section 1103, subdivision (a)(1), finding that it was both relevant and not overly prejudicial under section 352. The court also ruled that the prosecution could present evidence in rebuttal as to A.S.'s propensity for peacefulness, pursuant to section 1103, subdivision (b).

The next morning, before jury selection, the prosecutor moved to admit testimony from M.A., the mother of Hernandez's children, regarding a 2017 domestic violence incident between Hernandez and M.A. Although he initially sought to admit her testimony under section 1109, the prosecutor argued that it should be admitted as rebuttal evidence under section 1103, subdivision (b). Hernandez opposed admitting M.A.'s testimony on the grounds that the prosecution had given insufficient notice of her testimony, and that the testimony would be unduly prejudicial under section 352. The court allowed M.A.'s testimony and found that it was "highly relevant," not too remote in time, not untimely, and not unduly prejudicial. The court

limited the admission of M.A.'s testimony to rebutting the defense's evidence of A.S.'s character for violence under section 1103, subdivision (a)(1).

*E. Defense Witnesses*

The defense called N.L. to testify about her altercation with A.S. N.L. was in a romantic relationship with Hernandez from August to October 2021. One evening in early October 2021, Hernandez told N.L. to meet him at a trolley station. When she arrived, A.S. was also there. N.L. said that A.S. hit her first and gave her a black eye, and that N.L. never struck A.S. back. The next day, A.S. called N.L. to taunt and threaten her. A.S. continued to call her for several months afterwards to yell at N.L. and tell her to stay away from Hernandez.

An officer who responded to A.S.'s home in October 2021 testified that A.S. initially hung up on him and was not cooperative when he arrived. He said that contrary to what A.S. reported, he observed no damage to her screen door or doorbell camera. On cross examination, the officer explained why it is common for a victim of domestic violence to be argumentative while reporting a crime in progress. He also acknowledged that the doorbell camera was chipped and had been knocked onto the ground.

The emergency room physician who treated A.S. for her broken nose in late October 2021 testified that based on her observations alone, she could not determine how A.S.'s injuries occurred.

The defense also called Hernandez's father, who testified that A.S. often came to Hernandez's house after he was injured in a motorcycle accident in February 2022. They argued sometimes, but A.S. still visited and called in the weeks leading up to April 2022. Hernandez's father heard her yelling at Hernandez and asking for money. On cross-examination, he said

10

that he once gave A.S. $1,500 to compensate her for damage Hernandez did to her garage door.

The detective assigned to investigate the case testified that A.S. did not directly provide her with any of the threatening text messages she had received from Hernandez. On cross-examination, the detective explained that victims are instructed to upload photos or videos to an evidence server using a link. A.S. uploaded some of her text messages to the server, but also sent some screenshots from an April 2022 incident to the prosecutor. On redirect, when shown the text message screenshots, the detective said she could "see that they[] [were] sent from WhatsApp," and that the capitalization in the sender's name, "MaRCo," was "consistent with the text messages [A.S.] was receiving in the video" she recorded in April 2022 when Hernandez showed up to her house.

*F. Rebuttal Witnesses*

Before the prosecution's rebuttal witnesses testified, the trial court expressed regret over having allowed N.L.'s testimony because the defense had presented no evidence that A.S. was violent towards Hernandez, nor was there evidence Hernandez acted in self-defense. Defense counsel argued that N.L.'s testimony still served to impeach A.S., but the court noted that section 1103 evidence is "narrowly tailored" and that N.L.'s testimony about A.S.'s character for violence was "really tangential" and "minimally relevant." The prosecution then called M.A. and A.S.'s mother to rebut the section 1103 character evidence elicited through N.L.

M.A. testified that Hernandez is the father of her two children, and that they were in a relationship for several years. In March 2017, M.A. got into an argument with Hernandez in the presence of her family members. The argument became physical and M.A.'s family members stepped in "to

11

defend themselves." M.A.'s little sister called the police, but Hernandez "chased [the sister] back into the house with a knife[.]" Hernandez began choking M.A., holding her up in the air by her neck until M.A.'s other sister pepper-sprayed him. M.A.'s aunt also hit him with a ladder, and M.A. grabbed him by the testicles to defend herself. He left before the police arrived. On cross-examination, M.A. said she may have she grabbed Hernandez's testicles before he started choking her.

A.S.'s mother testified that A.S. is not a violent person, and that A.S. treated Hernandez in a caring manner.

*G. Jury Instructions and Verdict*

At the close of evidence, the trial court gave instructions to the jury on, among other things, the People's burden of proof (CALCRIM No. 220) and the union of act and general intent (CALCRIM No. 250). The court said, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." (See CALCRIM No. 220.) The court further stated that to find Hernandez guilty of the crimes he had been charged with, he "must not only commit the prohibited act or fail to do the required act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act or fails to do a required act. However, it is not required that he intend to break the law. The act required is explained in the instruction for that crime." (See CALCRIM No. 250.)

The court formulated its own instruction regarding section 1103 evidence relating to a person's character for violence, stating in relevant part that the jurors could "consider this evidence only for the purposes of determining whether the person acted in conformity with such character.

12

Whether a person had a character for violence and whether he or she acted in conformity with such character are matters for the jury to decide."

The court also gave an instruction regarding evidence that Hernandez had committed uncharged domestic violence (CALCRIM No. 852A) in February and July 2021. The court stated that the jurors could "consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence." (See CALCRIM No. 852A.)

For the stalking charge (Pen. Code, § 646.9, subd. (b)), the court gave an instruction stating, in relevant part, that the People had to prove that:

> "1. The defendant willfully and maliciously harassed or willfully, maliciously, and repeatedly followed another person;
>
> "AND
>
> "2. The defendant made a credible threat with the intent to place the other person in reasonable fear for her safety or for the safety of her immediate family." (See CALCRIM No. 1301.)

After deliberating for less than two hours, the jury found Hernandez guilty of all charges. Hernandez timely appealed.

## DISCUSSION

### I

Hernandez contends the trial court erred by admitting screenshots of Hernandez's text messages into evidence without proper authentication. We disagree.

*A. Governing Law*

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not

13

disturb a trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*); § 353.)

Screenshots are "writings" as defined by the Evidence Code. (§ 250; see *Goldsmith, supra*, 59 Cal.4th at p. 266.) Section 1400 provides that a writing may be authenticated by "(a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." "[W]hat is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible.' " (*Goldsmith*, at pp. 266–267.) Conflicting inferences regarding the writing's authenticity go to the weight of the writing as evidence, not its admissibility. (*Id.* at p. 267.)

A writing may be authenticated by a variety of means. (§ 1410 ["Nothing in this article shall be construed to limit the means by which a writing may be authenticated or proved."].) For example, "a writing may be authenticated by its contents and circumstantial evidence, including the testimony of witnesses other than the person or persons who created the writing or witnessed its creation. [Citations.]" (*People v. Cruz* (2020) 46 Cal.App.5th 715, 729, italics omitted.)

*B. Analysis*

The court did not abuse its discretion in ruling that the prosecution made a prima facie showing that the text messages depicted in the screenshots were sent by Hernandez to A.S. Before the screenshots were admitted, the People introduced doorbell camera video showing Hernandez texting A.S. from outside her front door in April 2022. The video, captured by the screen recording function on A.S.'s cell phone, shows incoming WhatsApp

14

messages from "MaRCo" saying "Fuck u" and "Bitch" while showing Hernandez typing on his cell phone at the same time. A.S. testified that she knew those messages were from Hernandez because she had saved his number, and the defense raised no objections to admitting the video.

When the People introduced the screenshots of text messages, A.S. testified that they were fair and accurate depictions of messages she received the same day she recorded the video. (See *Goldsmith, supra*, 59 Cal.4th at p. 267 ["A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted."].) She said she knew the messages were from Hernandez because she had his contact saved in her phone, and the screenshots themselves also showed the messages were from "MaRCo," matching the sender's name from the screen recording. Given this evidence, the court did not abuse its discretion in finding that that the prosecution made a prima facie showing which would allow the jury to reasonably determine that the messages in the screenshots were from Hernandez. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435 ["Although [the defendant] was free to argue otherwise to the jury, a reasonable trier of fact could conclude from the posting of personal photographs, communications, and other details that the MySpace page belonged to him."]

Hernandez contends that the authenticity of the screenshots was questionable because they showed no dates or phone numbers associated with the messages, and because law enforcement did not seize Hernandez's phone to obtain source data. Conflicting inferences regarding a writing's authenticity, however, go to the weight of the writing as evidence, not its admissibility. (*Goldsmith, supra*, 59 Cal.4th at p. 267.) Defense counsel had, and took advantage of, the opportunity to cross-examine A.S. at length about

15

the screenshots.  She then argued in closing that the jury should not give them any weight.  Accordingly, we conclude the court did not err in admitting the screenshots.

## II

We turn next to Hernandez's contention that the trial court erred by allowing rebuttal testimony regarding his prior violent conduct towards M.A. under section 1103, subdivision (b).[3]  Hernandez also asserts that to the extent his counsel invited error by opening the door for the admission of M.A.'s testimony, he was deprived of his right to effective assistance of counsel.

We conclude there was no reversible error, and even if there was, the invited error doctrine applies.  We also reject Hernandez's claim of ineffective assistance of counsel.

*A. Admissibility Under Sections 1103 and 352*

As noted, we review the trial court's decision to admit or exclude evidence for abuse of discretion.  (*Goldsmith, supra*, 59 Cal.4th at p. 266.) Section 1103 provides that "if . . . a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that (1) the victim was not a

---

[3]     In his opening brief, Hernandez mentions in passing that A.S.'s mother's testimony also should have been excluded along with M.A.'s, but the brief does not develop a separate argument as to why.  Neither the People's brief, nor Hernandez's reply brief, addresses the admissibility of A.S.'s mother's testimony.  Accordingly, we deem any challenge to the admission of her testimony forfeited.  (See *Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 856; see also *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].)

16

violent person, and (2) the defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*People v. Fuiava* (2012) 53 Cal.4th 622, 695–696 (*Fuiava*).)

Over the prosecution's objection, the trial court permitted the defense to present evidence of A.S.'s character for violence under section 1103, subdivision (a). Specifically, the defense called N.L. to testify that in her altercation with A.S., A.S. hit her first and gave her a black eye, and N.L. never struck A.S. back. Hernandez ultimately presented no evidence that would allow the jury to infer that A.S. acted violently during the events underlying the charges against him, but the defense asserted in its pre-trial brief that this evidence was admissible under section 1103 to prove A.S.'s character for violence and would "confirm" that she "was the aggressor[]" and she "act[ed] aggressively towards Mr. Hernandez and his family and friends." Defense counsel also represented to the court before trial that Hernandez would present "some sort of a self-defense" argument, and that N.L.'s testimony would be "relevant as to the violence within the relationship" between Hernandez and A.S. We cannot conclude that in relying on the defense's representations about its own anticipated evidence to determine whether N.L.'s testimony was relevant and admissible, the court exercised its discretion in " 'an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Goldsmith, supra*, 59 Cal.4th at p. 266.)

Because the defense presented evidence to prove the victim's character for violence under section 1103, subdivision (a), the court also did not abuse its discretion in finding that section 1103, subdivision (b), allowed the People to present M.A.'s testimony in rebuttal, subject to section 352. (See *Fuiava, supra*, 53 Cal.4th at pp. 681–682 ["[A]fter defendant introduced evidence to

17

establish [the victim's] character for violence, the prosecutor was permitted to establish and comment upon defendant's character for violence, demonstrated by his having committed violent acts, such as the prior assaults . . . ."].) Furthermore, because M.A.'s testimony was admissible under section 1103, subdivision (b), we need not and do not decide whether it was also admissible under other provisions, such as sections 1109 or 1101.

Hernandez argues that the court should have "revisited" its earlier ruling to allow N.L.'s testimony and "stricken the evidence or instructed the jury" to only use it for evaluating A.S.'s credibility. But even if we concluded the court erred in admitting N.L.'s testimony under section 1103, Hernandez invited any such error by choosing to introduce evidence that opened the door for the admission of M.A.'s testimony. " 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 393, 403.) The purpose of the invited error doctrine is to "prevent a party from misleading the trial court and then profiting therefrom in the appellate court. [Citations.]" (*Ibid.*) "[T]he operation of section 1103(b) is dependent upon a choice made by the defendant, in much the same way that other strategic choices made by the defense during a trial will make admissible evidence that otherwise would have been excluded." (*Fuiava, supra*, 53 Cal.4th at p. 698.)

Here, the court made clear to defense counsel *before* trial that if she chose to use N.L.'s testimony, the prosecution would be allowed to present M.A.'s testimony in rebuttal under section 1103. The defense nonetheless chose to present N.L.'s testimony for impeachment purposes. Having made that tactical decision, Hernandez cannot now obtain reversal on that ground. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 (*Coffman*) ["In

18

cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule. [Citations.]")

Lastly, Hernandez contends that M.A.'s testimony should have been excluded on section 352 grounds. Section 352 "permits a trial court, in its discretion, to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create the substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Coffman, supra*, 34 Cal.4th at p. 75.) The court properly weighed those factors here, finding that M.A.'s testimony was "highly relevant" because it involved conduct similar to what was being alleged. The court further found that the incident was not too remote in time because it happened five years before the trial; the rebuttal evidence was not untimely (see *People v. Hammond* (1994) 22 Cal.App.4th 1611, 1623–1624 [when defendant designated a witness shortly before trial, prosecutor did not violate disclosure requirements by failing to identify a rebuttal witness]); and admitting the evidence was not unduly prejudicial because it only required one witness's testimony. The court also limited the scope of testimony to rebutting the defense's evidence of A.S.'s character for violence under section 1103, subdivision (a)(1). We therefore conclude the court did not abuse its discretion in finding that the probative value of M.A.'s testimony outweighed the potential prejudice.

*B. Ineffective Assistance of Counsel*

We turn next to Hernandez's claim that his trial counsel's assistance was ineffective because she introduced N.L.'s testimony, which led to the admission of M.A.'s testimony. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an

objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Scott* (1997) 15 Cal.4th 1188, 1211; *Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*).)

Hernandez has not established any deficient performance based on his counsel's decision to introduce N.L.'s testimony. As noted, in addition to purportedly showing A.S.'s character for violence, Hernandez's counsel also argued that the testimony was relevant for impeachment purposes because A.S. said she did not know N.L. by her given name at the preliminary hearing. Defense counsel used N.L.'s testimony in closing argument to attack A.S.'s credibility, calling attention to the fact that A.S. continued to tell N.L. to stay away from Hernandez while simultaneously saying she was afraid of him. Defense counsel also emphasized the fact that A.S.'s account of the fight was inconsistent with N.L.'s version of events, and then referred to N.L.'s testimony to argue that A.S. used the DVROs to retaliate against Hernandez out of jealousy and a desire to control him.

We cannot second-guess defense counsel's tactical decision to make use of this evidence in Hernandez's defense, especially given its consistency with other themes in the defense's evidence. Aside from N.L., the defense also called witnesses to testify that A.S. was uncooperative and not fully forthcoming with responding officers, may have exaggerated the property damage caused by Hernandez, and failed to send screenshots of text messages to the investigating detective. The defense also called Hernandez's father to testify that A.S. yelled at Hernandez and asked for money, which suggests that A.S. had ulterior motives for calling the police. Hernandez's

20

counsel thus made a tactical decision to use N.L.'s testimony, along with other witnesses' testimony, to cast doubt on A.S.'s version of events. This would have been a rational reason for introducing N.L.'s testimony, even if it meant the jury would also hear M.A.'s testimony about Hernandez's prior violence. Accordingly, Hernandez cannot demonstrate deficient performance on this record. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1052 [reviewing court will find ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission" (internal quotation marks omitted)].)

Even assuming any deficient performance by defense counsel, her performance did not cause prejudice "in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (2001) 26 Cal.4th 1100, 1122–1123, quoting *Strickland, supra*, 466 U.S. at p. 686.) There was ample evidence supporting the prosecution's case against Hernandez, including A.S.'s detailed testimony regarding the charged and uncharged instances of domestic violence, videos and photographs showing Hernandez standing outside of A.S.'s home on multiple occasions in violation of the DVROs, photographs of A.S.'s bruises and broken nose, screenshots of Hernandez's threats, V.S.'s testimony about Hernandez showing up to A.S.'s house, testimony from treating physicians and responding officers corroborating A.S.'s testimony, and the parties' stipulations regarding the DVROs. The jury deliberated for less than two hours before convicting Hernandez. (See *People v. Myers* (2007) 148 Cal.App.4th 546, 553 [no prejudice from counsel's failure to object to section 1103 evidence because jury credited victim's testimony and deliberated "for less than two hours"].) On this record, there is

no reasonable probability the jury would have reached a different result without the admission of M.A.'s testimony.

## III

We turn next to Hernandez's instructional error claims. He contends that the court erred by failing to instruct the jury on the union of act and specific intent (CALCRIM No. 251) and by failing to instruct the jury on the applicable burden of proof for rebuttal evidence admitted under section 1103, subdivision (b). We conclude that neither constituted reversible error.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We ask whether the instructions as a whole fully and fairly set forth the applicable law, and assume that jurors are capable of understanding and correlating all jury instructions given. (*Ibid.*) Where reasonably possible, we interpret the instructions to support the judgment. (*Ibid.*)

### A. Union of Act and Intent

"A trial court has a sua sponte duty to instruct on all of the elements of a charged offense [citations], including the mental state required to commit the offense and the union of that mental state and the defendant's act [citations]." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1160 (*Jo*).) The Judicial Council's Bench Notes to CALCRIM Nos. 250 (general intent) and 251 (specific intent) state that the general intent instruction must not be used if the crime requires a specific mental state, such as knowledge or malice. Similarly, the Judicial Council's Bench Notes to both instructions state that if a case involves both offenses requiring a specific intent or mental state and offenses that do not, "the court may give CALCRIM No. 252, Union

of Act and Intent: General and Specific Intent Together," instead of CALCRIM No. 250 or 251.

Hernandez was charged with stalking under Penal Code section 646.9, subdivision (b), which makes it a crime to "willfully and maliciously" harass or follow another person and make "a credible threat with the intent to place that person in reasonable fear" for her safety when there is a court order in effect prohibiting that behavior. (Pen. Code, § 646.9, subd. (b).) The stalking charge requires "a specific mental state," namely, the specific intent to place another person in fear for her safety.

The People correctly concede that CALCRIM No. 250 should not have been given for this specific intent offense. CALCRIM No. 250 states that "[a] person acts with wrongful intent when he intentionally does a prohibited act . . . . However, it is not required that he intended to break the law. The act required is explained in the instruction for that crime." The jury should have been instructed that to find a person guilty of stalking with a court order in effect, the person "must not only intentionally commit the prohibited act . . . but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime." (CALCRIM No. 251.) Thus, the use of CALCRIM No. 250 was inappropriate.

The court's error, however, was harmless. Instructional error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [prosecution bears burden of showing that federal constitutional error was harmless beyond a reasonable doubt], or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [defendant must demonstrate reasonable probability of a more favorable result for state-law errors]. We need not determine, however, which standard applies because we find that the error would be harmless under either the *Watson* standard for state-law error or

23

the *Chapman* standard for federal constitutional error. (*Watson*, at pp. 836–837; *Chapman*, at p. 24.)

In this case, there is little practical significance between the incorrect formulation given by the trial court and the correct version. The court properly instructed the jury that the prosecution had to prove Hernandez intentionally committed a prohibited act, and the court also referred the jury back to the instruction for stalking, which stated the proper mental state required. (See CALCRIM No. 1301.) The correct instruction would have also explained that the prosecution was required to prove Hernandez intentionally committed a wrongful act. But "CALCRIM No. 250, though technically inappropriate, did nothing to remove the mental state element from the jury's consideration or relieve the prosecution of its burden of proof." (*Jo, supra*, 15 Cal.App.5th at p. 1161.)

Furthermore, any error was made harmless by the ample evidence that Hernandez acted with specific intent to place A.S. in reasonable fear for her safety and her immediate family's safety while the criminal DVRO was in effect. Evidence from witness testimony, videos, and photographs showed that Hernandez showed up to A.S.'s home on multiple occasions in April 2022, banging on her door and calling her phone repeatedly. During one of these visits, Hernandez splashed beer on A.S.'s face. A.S.'s daughter was also so alarmed by his presence that on more than one occasion, she hid in the closet and called 911. A.S. and her daughter both testified that they feared for their safety, and the text message screenshots included explicit threats against both A.S. and her family.

This evidence was sufficient to satisfy the prosecution's burden of proving beyond a reasonable doubt that Hernandez willfully and maliciously harassed and threatened A.S. with the intent to place her in reasonable fear

for her and her immediate family's safety. We therefore conclude that the failure to instruct the jury with CALCRIM No. 251 was harmless beyond a reasonable doubt (*Chapman, supra*, 386 U.S. at p. 24), and reject Hernandez's first claim of instructional error.

### B. Preponderance Instruction

"A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal [citations]." (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*); *People v. Welch* (1999) 20 Cal.4th 701, 757 [where "the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the *additional or qualifying instruction* in order to have the error reviewed." (Internal quotation marks omitted.)].)

Hernandez does not contend the court's instruction on the People's rebuttal evidence under section 1103, subdivision (b), misstated the law. He argues, rather, that the court should have *added* to its instruction that M.A.'s testimony should not be considered unless the jury first determines the prosecution proved the act by a preponderance of the evidence. But Hernandez forfeited his claim of error because if he "believed the instruction . . . required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court." (*Lee, supra*, 51 Cal.4th at p. 638.) When the court asked the parties whether they had any objections to the proposed character evidence instruction, neither party objected. And after the parties finished discussing all the instructions, the court gave them another opportunity to "add [or] object to" any of the instructions. At no point did Hernandez's attorney request that the court add the preponderance

25

standard to the character evidence instruction, so Hernandez has forfeited the issue.

Even if we were to address the merits of Hernandez's contention, we would conclude that the jury instructions on the burden of proof were adequate. First, the court gave an instruction very similar to one that the Supreme Court in *Fuiava* found proper. (*Fuiava, supra*, 53 Cal.4th at p. 698.) The instructions are identical except that here, the court added an admonition that the jury could "consider this [character] evidence only for the purposes of determining whether the person acted in conformity with such character."[4] This addition did not prejudice Hernandez, nor is it an inaccurate statement of the law.

Second, other jury instructions sufficiently apprised the jury of the relevant principles of law on the burden of proof. When the court instructed the jury regarding evidence of uncharged domestic violence under section 1109, the court stated that jurors could "consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence." (See CALCRIM No. 852A.) The court also instructed the jury that unless otherwise specified, the People's burden of proof was "beyond a reasonable doubt." (See CALCRIM No. 220.) Reviewing the instructions as a whole, we find no " 'reasonable likelihood that the instruction [on character evidence] caused the jury to misconstrue or misapply the law' [citation]." (*Lee, supra*, 51 Cal.4th at

---

4    In *Fuiava*, the trial court instructed as follows: "A person's character for violence may be shown by evidence of reputation, opinion, or specific acts of violence. Evidence of a person's character for violence may tend to show the person acted in conformity with such character. [¶] Whether a person had a character for violence and whether he acted in conformity with such character are matters for the jury to decide." (*Fuiava, supra*, 53 Cal.4th at pp. 694–695.)

26

p. 640.)  Accordingly, we conclude the trial court did err because it had no sua sponte duty to further instruct that the jury should apply a preponderance standard to the People's rebuttal evidence under section 1103.

## DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.